Oscar KILGO, et al., Plaintiffs,

v.

BOWMAN TRANSPORTATION,
INC., Defendant.

Civ. A. No. C79–674A.

United States District Court,
N.D. Georgia,
Atlanta Division.

May 20, 1983.

Christopher Coates, Laughlin McDonald, Neil Bradley, American Civil Liberties Union, Atlanta, Ga., Isabelle Katz Pinzler, John E. Bertin, American Civil Liberties Union, New York City, for plaintiffs.

James W. Wimberly, Jr., James P. Cobb, E. Ray Stanford, Jr., Atlanta, Ga., for defendant.

## ORDER

SHOOB, District Judge.

Edna Kilgo filed this class action lawsuit under Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e et seq., on April 23, 1979, alleging sexual discrimination by defendant Bowman Transportation, Inc., (Bowman). On March 31, 1980, the Court allowed an amendment of plaintiff's complaint to add plaintiff Virginia Wentz as a party plaintiff. *Kilgo v. Bowman Transportation, Inc.,* 87 F.R.D. 26 (N.D.Ga.1980). In the said order, the Court also allowed for the substitution of Mrs. Kilgo's husband, Oscar Kilgo, as a party plaintiff in his capacity as a representative of the estate of Edna Kilgo, who died subsequent to the filing of this action. Defendant Bowman is an interstate trucking company which maintains its executive headquarters in De-Kalb County, Georgia.

Plaintiffs contend in this action that Bowman discriminates against women on the basis of their sex in its hiring of over-

the-road drivers. First, plaintiffs contend that Bowman's one year prior experience requirement for over-the-road drivers has a discriminatory impact upon females which, according to plaintiffs, defendant is unable to demonstrate furthers a job-related, business necessity. Second, plaintiffs contend that defendant's alleged arbitrary and discriminatory enforcement of its prior experience requirement shows that the said requirement is a pretext for Bowman's discriminatory hiring practices. Third, plaintiffs assert that defendant had alternative selection devices for over-the-road drivers that would have had a lesser disparate impact upon female applicants than the one year prior experience requirement. Fourth, plaintiffs maintain that Bowman participates in a general, classwide pattern and practice of disparate treatment of female applicants for over-the-road driver positions. Defendant denies liability as to all of plaintiffs' contentions.

The case was tried before the Court without a jury on March 1–22, 1982. At the end of the trial the Court directed the parties to file proposed findings of fact and conclusions of law within thirty days after their receipt of the trial transcript. Subsequently, the Court granted the parties various extensions of time for the filing of the said findings and conclusions. On December 17 and 21, 1982 defendant and plaintiffs respectively filed their proposed findings of fact and conclusions of law and the case is finally before the Court for decision on the merits. The case is also presently before the Court on (1) plaintiffs' motion for redefinition of the class, and (2) plaintiffs' motion for consolidation of this action and *Tarvin v. Bowman Transportation, Inc.,* Civil Action No. C82–2679A (N.D.Ga.). The Court will address these two motions of plaintiffs before enumerating its findings of fact and conclusions of law.

PLAINTIFFS' MOTION FOR REDEFINITION OF THE CLASS

■ On March 31, 1980, the Court conditionally certified the class, as proposed by plaintiffs, to include

[a]ll females who, since April 18, 1976, have, would have but for the futility of doing so, or will in the future seek *permanent employment* as an over-the-road truck driver with Defendant by applying *through* its Atlanta, Georgia, terminal, and who have been, would have been, or will be refused such employment . . . due to defendant's alleged discriminatory practices.

(Emphasis added.) Order of March 31, 1980, at p. 4. Subsequently, defendant moved to define and/or decertify the conditionally certified class, and for reconsideration of the Court's finding concerning the cut-off date for the class. On March 1, 1982, the Court denied defendant's motion to decertify the class and its motion for reconsideration of the finding concerning the cut-off date. At that time, the Court redefined the class as follows:

[T]he class *includes* any applicant who, meeting other class standards, (1) was hired by defendant as an over-the-road driver but was terminated within the 45-day probationary period, (2) was not hired as an over-the-road driver and her application was, for one reason or another, forwarded to the Atlanta terminal for its review, and (3) any prospective applicant, meeting other class standards, whose application, had she filed one, would have been forwarded to the Atlanta terminal.

Order of March 1, 1982, at pp. 3–4.

Now, plaintiffs seek a redefinition of the class, only with respect to the disparate impact claim, as follows:

All females who since April 18, 1976, have, would have but for the futility of doing so, or will in the future seek permanent employment as an over-the-road truck driver with defendant by *applying at any of its terminals,* and who have been, would have been, or will be refused such employment due to the operation of defendants' commercial, over-the-road tractor trailer driving experience requirement.

(Emphasis added.) This new expanded class includes, for purposes of the disparate impact claim, applications that were neither

filed at the Atlanta terminal nor forwarded to the said terminal. Defendant strenuously opposes plaintiffs' motion for redefinition of the class, arguing that the said redefinition would (1) prejudice its right to be heard on the adverse impact claim in violation of the due process clause; and (2) that the said redefinition would violate Rules 16 and 23, F.R.Civ.P., and Local Court Rule 222.13. For the reasons noted below, the Court concludes that defendant's arguments against redefinition of the class are without merit.

First, as the record shows and as this Court specifically finds in the findings of fact, defendant's experience requirement is a company-wide policy, imposed in the late part of 1974 for all of defendant's terminals other than its Birmingham, Alabama, terminal and terminals that forwarded their applications to the said terminal (hereinafter the Birmingham region.) Transcript at pp. 212, 273, 1126; *infra* at ¶ 1. The record also shows, and the Court has found, that in the late part of 1974 a six months experience requirement was imposed at the Birmingham region, in lieu of the one year requirement in effect throughout the remainder of the company. Transcript at pp. 212, 273, 1126–27; *see* ¶ 1, *infra*. The one year experience requirement was extended to the Birmingham region sometime in 1976. *See* ¶ 2, *infra*. Therefore, given the company-wide basis of the experience requirement, defendant's asserted business justification for the requirement is equally applicable to the requirement whether it is examined in terms of applicants seeking employment through the Atlanta terminal or through any other of defendant's terminals.

Second, defendant's due process rights are not infringed by the enlargement of the class. Defendant contends that if the redefinition had been made prior to trial, it would have had an opportunity to produce system-wide data. This argument would be meritorious if the Court agreed with defendant's underlying premise, which is that the statistical analysis best suited to examine defendant Bowman's experience requirement is to compare its applicant flow

system-wide with the number of women hired by Bowman for the relevant time period system-wide. As discussed later, the Court concludes that defendant's applicant flow is not an appropriate labor pool for determining disparate impact. *See* ¶ 17, *infra*. Thus, defendant's lack of an opportunity to introduce system-wide data does not deprive it of due process since such data is immaterial. Moreover, defendant's expert witness testified at the trial that there is no available system-wide data of defendant's applicant flow. Transcript at pp. 726–27.

Additionally, as noted later, the Court's ruling that defendant's prior experience requirement has had an adverse impact against women is premised on a comparison of defendant's women hirees for the relevant time period with two labor pools which are equally applicable to applications filed through the Atlanta terminal or through other terminals. These labor pools are the general labor force, of which women represent approximately 40%, and the national labor pool of truck drivers, of which women represented 2.2% in 1980. Accordingly, the lack of data regarding specific local labor pools from each of the regions where defendant hires truck drivers does not affect this Court's ultimate conclusion that adverse impact has been shown.

For the foregoing reasons, plaintiffs' motion for redefinition of the class, for purposes of their disparate impact claim, is hereby GRANTED.

PLAINTIFFS' MOTION FOR CONSOLIDATION

 Plaintiffs seek to consolidate this action and *Tarvin v. Bowman Transportation, Inc.*, Civil Action No. C82–2679A, also pending before this Court. The *Tarvin* case was filed on November 29, 1982, and there have been no substantial proceedings undertaken therein. Defendant opposes consolidation of this action.

The Court concludes that consolidation of these two actions would be inappropriate. Consolidation of cases at such different stages, such as a recently filed case with no substantive proceedings undertaken and a

case more than four years old awaiting decision, is not advisable. Also, given this Court's redefinition of the class, Ms. Tarvin, who filed her application with defendant at its Birmingham terminal, is within the parameters of the newly-defined class. Accordingly, plaintiffs' motion for consolidation is hereby DENIED.

## FINDINGS OF FACT

### ADVERSE IMPACT CLAIM

1. Since late 1974 defendant has required as a prerequisite for employment as an over-the-road tractor trailer driver one year of prior experience as such. Transcript at pp. 212, 273, 1126–27. The said requirement was imposed on a company-wide basis, with the exception of the Birmingham region, for which a six-month prior experience requirement was then imposed *Id.*

2. The one year prior experience requirement was extended to the Birmingham region sometime in 1976. Transcript at 214–15, 1009–10, 1031, 1033. The Court discounts the testimony of Mr. Jule Wood, defendant's director of safety and personnel, that the one year prior experience requirement was not enforced in the Birmingham region until 1977 or 1978. *Id.* at 214–15. Mr. Wood's testimony by his own words was at best "a guess". *Id.* On the other hand, in answers to interrogatories verified on July 31, 1979, Mr. Wood testified that the one year requirement had been in effect in the Birmingham region "since 1976".

3. Defendant's company-wide prior experience requirement for over-the-road driver positions, as shown on a sign located in defendant's Atlanta office of safety and personnel, states that an applicant *must* be at least 25 years of age and possess at least one year, over-the-road, commercial, tractor trailer driving experience. Transcript at p. 216; Plaintiffs' Exhibit 228. The prior experience is considered "over-the-road" if the applicant's experience involved driving a distance greater than a seventy-five mile radius from the terminal of dispatch. Transcript at p. 250. An applicant satisfies

the prior experience requirement based upon the length of his or her prior employment rather than the number of miles driven. *Id.* at 256.

4. Truck driving which does not involve the operation of a tractor trailer does not fulfill defendant's prior experience requirement; neither does driving a tractor trailer in the military service. Transcript at pp. 261–62.

5. Defendant reserves the right to transfer any of its road drivers to any of its terminals. Transcript at p. 292.

6. The available labor pool of experienced road drivers was no different in the Birmingham region than in other regions where defendant hires road drivers. Specifically, Mr. Ben Sergarant, who worked for Bowman since 1963 and who was an assistant safety supervisor in 1976, testified that he had never heard any mention of the purported fact that it was more difficult to employ experienced drivers in the Birmingham region. Transcript at pp. 430, 435.

### STATISTICAL COMPARISONS FOR THE ADVERSE IMPACT CLAIM

7. The relevant labor pool is the standard by which defendant's hiring of over-the-road drivers is measured to determine whether the said requirement has an adverse impact on women applicants. Various labor pools were suggested by the parties in the course of this litigation, ranging from the general labor force through various specific truck driver and related labor forces to the actual applicants to Bowman. It is undisputed that no one labor pool by itself provides an entirely accurate picture of defendant's hiring practices. Therefore, the Court will examine various relevant labor pools to determine whether defendant's experience requirement has had an adverse impact upon women applicants.

8. The record shows that approximately 40% of the United States' general labor force is composed of females. Transcript at p. 509. The record also shows that, based upon preliminary data from the 1980 Census, 2.2% of truck drivers nationally are female. Transcript at p. 689. Additionally,

the United States Bureau of Labor Statistics' *Employment and Earnings* states that in 1980 2.2% of truck drivers nationally were female. Plaintiffs' Exhibit 225. The Court finds the above figures to be the most helpful in assessing the case. Of course, these labor pools are national and the hiring practices in question are regional or even local. Nevertheless, given that defendant hires over-the-road drivers throughout the Southeastern United States, as opposed to only in one or two cities, the Court finds national statistics appropriate. Furthermore, as it relates to applications filed through the Atlanta terminal, there is little difference between the percentage of female truck drivers nationally and the percentage of female truck drivers in the Atlanta Standard Metropolitan Statistical Area (SMSA), 2.1% in 1970. *Id.* at 597–98. Moreover, this minimal difference causes no statistically significant difference for purposes of determining whether Bowman's hiring rate for females indicates something more than random selection at work. *Id.* at 598. Of course, the Census 1980 data is more current than the 1970 data for the Atlanta SMSA.

9. The record shows that 18 is the maximum number of female hirees for over-the-road truck driver positions with defendant suggested by either party. This figure includes two women who were re-hirees and two women who were discharged during the 45-day probationary period. Plaintiffs' Exhibit 227. The Court concludes, for the reasons stated below, that at least four of the said 18 female hirees claimed by defendant should not be counted. These four women, Joyce Johnson, Joyce Ann Livingston, Wanda Jean Hammack, and Emmy Lou Killingsworth, were all married to male Bowman drivers at the time they were hired. Plaintiffs' Exhibit 227.

10. The record shows that defendant was reluctant to assign women to trucks with men to whom they were not married. Transcript at pp. 417–18. Thus, the said four women, unlike the vast majority of potential female applicants, were not victims of this particular discriminatory policy of defendant. However, ultimately, these women, would not have been hired had defendant enforced its anti-nepotism rule at the time they were hired. The said policy the record shows existed, but was not actually enforced by defendant until approximately 1978. Transcript at p. 57.

11. A comparison of defendant's rate of female hirees for over-the-road driver positions with the percentage of females in the general labor force, approximately 40%, shows a dramatic underrepresentation of women in Bowman's over-the-road tractor trailer drivers. Transcript at p. 509. Nevertheless, the expert witnesses in this case agree that it may be necessary to reduce the female proportion of the general labor force, given that women, at least at this time, may not be interested in the job of over-the-road truck driver to the same degree that men are. However, there is no way to objectively quantify the amount of this reduction. Transcript at p. 934. Moreover, there are two relevant observations to be made with respect to this differential interest of women in truck driver positions.

12. First, defendant failed to introduce any evidence which would explain why women, who constitute 40% of the general labor force in this country, constituted only 2.2% of truck drivers nationally in 1980 and less than 2% of Bowman's company-wide over-the-road truck driver hirees during the 1976–80 period. Transcript at p. 1599. Second, since an over-the-road truck driver position pays significantly more than other jobs available to women with limited educational backgrounds, it is reasonable to expect a substantial supply of women willing and ready to accept employment as an over-the-road truck driver. Transcript at pp. 526, 950. Thus, even if it is necessary to reduce the female proportion of the general labor force, the Court concludes that any such reduction would not in any way alter the fact that there is a significant underrepresentation of women in defendant's over-the-road tractor trailer drivers.

13. The testimony of Dr. Michelle White and Dr. Martin Shapiro satisfies this Court that defendant's hiring rate for female

over-the-road truck drivers, even assuming the maximum 18 hirees possible suggested by defendant, when compared to the 2.2% female 1980 truck driving pool, shows a statistically significant underrepresentation of women among defendant's hirees. Transcript at p. 598, plaintiffs' Exhibits 221, 222 (White); transcript at pp. 1493–94, 1594–95 (Shapiro).

14. In addition to the national truck driver labor pool, of which females constituted 2.2% in 1980, and the general labor force, of which females constituted 40% in 1980, both parties have proffered a variety of other possible labor pools with which to compare defendant's work force. Plaintiffs' expert, Dr. White, compared several of these labor pools to Bowman's hiring record assuming a different number of actual female hirees ranging from 15–18. Plaintiffs' Exhibit 215–222. The Court finds Dr. White's statistical analysis to be reliable and to further demonstrate the underrepresentation of women in defendant's over-the-road driver work force.

15. Assuming that defendant hired 18 women and 1406 men, females would thereby represent 1.26% of the persons who were hired and:

(a) compared to truck drivers in Georgia in 1970, of whom females constituted 1.96%, defendant's hiring rate of women was 1.92 standard deviations below women's representation in this labor pool. Therefore, it could have occurred as many as 2.8 times in 100. This is not considered statistically significant, and it does not by itself permit the rejection of the supposition that defendant's hiring is independent of sex. However, this comparison assumes the hiring of 18 women, whereas, the Court found that no more than 14 of these individuals should be counted, and, of course, 1970 Census data used for this comparison does not take into account the drastic increase between 1970 and 1980 in the proportion of women in jobs formerly dominated by men, including blue collar jobs;

(b) compared to truck drivers, bus drivers, route men, and delivery men in Georgia in 1970, of whom females constituted 4.06%,

defendant's hiring rate of women was 5.30 standard deviations below women's representation in this labor pool and therefore, the probability was less than 1 in 1 million that Bowman's hiring of truck drivers was independent of their sex;

(c) compared to Class Five license holders (the license required to drive a tractor trailer) in Georgia in 1980, of whom females constituted 2.44%, defendant's hiring rate for women was 2.87 standard deviations below women's representation in this labor pool, and therefore the probability is 1 in 1000 that defendant's hiring of truck drivers was independent of their sex;

(d) compared to truck drivers in the Atlanta SMSA in 1970, of whom females constituted 2.1%, defendant's hiring rate of women was 2.34 standard deviations below women's representation in this labor pool, and therefore the probability was 9 in 1000 that defendant's hiring of truck drivers was independent of their sex;

(e) compared to the number of unemployed persons in motor freight occupations in Georgia in 1980, of which females constituted 2.15%, defendant's hiring rate was 2.75 standard deviations below women's representation in this labor pool, and therefore the probability is 3 in 1000 that defendant's hiring of truck drivers was independent of their sex.

16. Assuming that defendant hired 15 women and 1406 men, females would represent 1.06% of the persons that were hired and:

(a) compared to truck drivers in Georgia in 1970, of whom females constituted 1.96%, defendant's hiring rate of women was 2.49 standard deviations below women's representation in this labor pool, and therefore the probability was .5 in 100 that defendant's hiring of truck drivers was independent of their sex;

(b) compared to truck drivers, bus drivers, route men, and delivery men in Georgia in 1970, of whom females constituted 4.06%, defendant's hiring rate of women was 5.89 standard deviations below women's representation in this labor pool, and therefore

the probability was less than 1 in 1 million that defendant's hiring of truck drivers was independent of their sex;

(c) compared to Class Five license holders in Georgia in 1980, of whom females constituted 2.44%, defendant's hiring rate of women was 3.37 standard deviations below women's representation in this labor pool, and therefore the probability is 1 in 10,000 that defendant's hiring of truck drivers was independent of their sex;

(d) compared to truck drivers in the Atlanta SMSA in 1970, of whom females constituted 2.1%, defendant's hiring rate of women was 2.92 standard deviations below women's representation in this labor pool, and therefore the probability was 12 in 10,000 that defendant's hiring of truck drivers was independent of their sex;

(e) compared to the number of unemployed persons in motor freight occupations in Georgia in 1980, of which females constituted 2.15%, defendant's hiring rate was 2.38 standard deviations below women's representation in this labor pool, and therefore the probability is 12 in 10,000 that defendant's hiring of truck drivers was independent of their sex.

17. Defendant's applicant flow for over-the-road drivers is not an appropriate labor pool for several reasons. First, the posted experience requirement at defendant's Atlanta terminal was more likely to dissuade women than men from filing applications because women are less likely than men to satisfy the posted experience requirement; there is no evidence that anyone other than a few of Bowman's supervisors were aware of the fact that the over-the-road element of the prior experience requirement, as contended by defendant, is a preference, rather than an enforced requirement. Transcript at pp. 520–21, 575–76, 1488–89. Second, the record shows that a number of women were not allowed to file written applications with defendant. Specifically, plaintiff Virginia Wentz was not allowed to file a written application when she presented herself at Bowman's Atlanta terminal in 1979 and former named plaintiff Edna Kilgo was not allowed to do

so until after she filed a charge of discrimination with the Equal Employment Opportunity Commissions (EEOC). *Id.* at pp. 146, 16. Therefore, the applicant flow does not accurately reflect the persons who presented themselves at defendant's terminals for the purpose of completing an application.

18. In conclusion, a comparison of defendant's hirees system-wide with the general labor force and the general truck driver labor force shows a statistically significant underrepresentation of women which establishes plaintiffs' prima facie case of adverse impact. A comparison of defendant's data with the other labor pools suggested by the parties provides further support for the above finding.

WHETHER THE EXPERIENCE REQUIREMENT IS JOB RELATED

19. Sometime after defendant imposed its one year prior experience requirement for over-the-road driver positions, it acquired another trucking company, Braswell Motor Lines. Transcript at pp. 1140–41. According to Grady Dellinger, Bowman's assistant director of safety and personnel company-wide, Bowman and Braswell agreed, as part of the acquisition of the latter, that Bowman would hire all of Braswell's then present employees regardless of whether they satisfied Bowman's experience requirement. *Id.* at 1151. As a result of this agreement, Bowman hired Robert Bailey, a former mechanic of Braswell, for an over-the-road driver position despite the fact that Mr. Bailey did not satisfy the prior experience requirement. Plaintiffs' Exhibit 57.

20. Bowman, as a matter of standard procedure, permits new over-the-road drivers to commence their employment prior to its receipt of the new driver's "Motor Vehicle Report" (MVR). Transcript at pp. 1034–35. The said report contains a driver's prior driving record. This is done in spite of uncontroverted testimony by defendant's witness Mr. Charles Rogers, a representative of defendant's insurer, that allowing a new driver to commence driving before the employer receives the driver's

MVR, from the states in which the applicant has resided, could result in the hiring of unsafe drivers. *Id.* at pp. 358–59.

21. Defendant hires over-the-road drivers with as many as three prior convictions for driving under the influence of alcohol, so long as none of the convictions was within the last three years. Transcript at pp. 1047–48. Furthermore, in so doing, Bowman does not require such drivers to have participated in any type of alcohol rehabilitation program. *Id.* at 1048.

22. At the trial defendant alluded to a cease and desist order issued by the U.S. Department of Transportation (DOT) in the early 70's against Bowman. Transcript at pp. 1398–99. Defendant failed to introduce any documentary evidence regarding the said cease and desist order. *Id.* Mr. Wood testified that DOT found that Bowman drivers had violated DOT's regulations which establish the maximum number of hours a driver may be on duty within a given period of time. According to Mr. Wood, DOT found that such violation had contributed to an excessive number of accidents on the part of Bowman drivers. *Id.* at 1444–45. However, Bowman produced no evidence which would indicate that the DOT case and desist order linked in any way Bowman's employment of drivers without one year prior experience and its excessive accident rate.

23. The Court concludes that defendant's argument that the experience requirement was initially imposed as a measure to improve its accident rate, in other words, as a safety measure, is without support in the record. First, the imposition of a non-uniform requirement throughout its facilities undercuts such contention. As noted, the requirement in the Birmingham region, until 1976, was only six months of prior experience, whereas defendant could have transferred drivers from elsewhere to that region if necessary. The record also shows that the available labor pool of experienced road drivers was no different in Birmingham than elsewhere. *See* ¶ 6, *supra.*

Second, defendant failed to explain satisfactorily why neither driving a tractor trailer in the military, where many women might have gained that experience, nor driving a tanker satisfies its requirement. Third, defendant's acceptance of a Braswell Motor Lines' employee as an over-the-road tractor trailer driver without prior experience is inconsistent with its position. Fourth, defendant's procedure of allowing new hirees to commence their employment prior to its receipt of their MVR refutes its argument that the experience requirement was imposed as a safety measure. Fifth, defendant's hiring of drivers with as many as three prior driving under the influence convictions hardly supports its stated concern for safety. Sixth, defendant's waiver of the requirement with respect to numerous male applicants persuades the Court that defendant was not overly concerned about the requirement as a safety measure. *See* ¶¶ 37–41, *infra.*

24. Defendant's contention that its prior experience requirement was imposed to reduce insurance costs is unconvincing. Early in these lengthy proceedings, defendant stated in answers to plaintiffs' interrogatories, verified on July 31, 1979, that the reasons underlying the imposition of the prior experience requirement were the following:

> Defendant has always preferred drivers with experience. Until late 1974 hired as trainees only some drivers with only a years over the road experience. In '73 and '74 defendant laid off more than a 150 over the road drivers and many other employees. As employees were needed again defendant recalled employees from layoff whenever possible instead of hiring new employees. Since that time defendant has been able to obtain an abundance of over the road drivers with the required year of experience and has not hired any more trainees. Defendant's policy has been and is now to hire only drivers with the required year of experience. The only exception was at Birmingham stated in answer to interrogatory 12.

Transcript at pp. 258–59.

25. In the same answers to plaintiffs' interrogatories, defendant contended that it

did not know whether it would rely upon the need for insurance coverage as a defense in this action. Transcript at p. 1131. Later, defendant asserted, in its answer to plaintiffs' interrogatories of December 19, 1980, that it "does not rely upon any need for insurance coverage as a justification or defense in this case." *Id.* at pp. 1132–33. On March 13, 1981, some two years after the filing of the complaint, defendant suddenly discovered that obtaining insurance coverage was a reason for the establishment of the said requirement. *Id.* at p. 1133.

Mr. Wood testified at the trial that he had never discussed the advantages and disadvantages of defendant's experience requirements with representatives of the Transit Casualty Company, which insured Bowman until 1980, or representatives of Carrier Company, which began insuring Bowman in 1980. Transcript at pp. 1005–06. Additionally, Bowman was not required to report to either insurance company whether new over-the-road drivers satisfied the experience requirement or whether employees involved in accidents had experience at the time of hire or of the accident. *Id.* at pp. 1006–07. Defendant offered no evidence to explain why it took two years of protracted litigation for it to discover that insurance was a factor in its decision to impose the experience requirement in late 1974. Defendant's behavior and Mr. Wood's trial testimony satisfy the Court that Bowman's attempt to justify the experience requirement in terms of its insurance needs is at best an afterthought.

26. Defendant's various attempts to validate its prior experience requirement were commenced after the filing of this lawsuit. Transcript at p. 1132. Specifically, defendant's job analysis, which according to Bowman is a content validation study, was not performed until the month of February, 1982, immediately prior to the commencement of the March, 1982 trial of this action. *Id.* at pp. 605–06, 754, 1008; Defendant's Exhibit 1185.

27. Defendant attempted, through its job analysis, to validate its prior experience requirement for over-the-road driver positions by showing that the national profile of tractor trailer drivers is significantly similar to the profile of Bowman truck drivers. According to Bowman, a showing of such similarity in the two profiles demonstrates that a requirement of past experience in the trucking industry is related to the job of over-the-road tractor trailer driver for defendant. Assertedly, the job in question at Bowman would require those attributes or behavior which are normally possessed by tractor trailer drivers nationally. Transcript at pp. 617, 621, 623, 635, 914.

28. The Court concludes that defendant's job analysis does not validate either defendant's posted requirement (one year tractor trailer, OTR commercial driving experience) or the requirement that Bowman contends it enforces (one year tractor trailer, commercial driving experience with a preference for OTR) for the following reasons. First, defendant's witness Dr. Ledvinka testified that the job analysis at best only validated generally an experience requirement and not the specific requirement enforced by defendant. Second, the said job analysis neither addressed the distinction between city and over-the-road experience nor the distinction between tractor trailer driving and non-tractor trailer experience. Transcript at p. 1288. Third, defendant's expert witnesses conceded that a job analysis such as the one performed here would generally validate an experience requirement for any occupation because it is generally the case that a profile of incumbents in a particular industry will resemble the incumbent employees of a particular employer within that industry. *Id.* at pp. 805, 911–12. Thus, in an industry such as trucking, which has been and continues to be almost exclusively male, validation of a prior experience requirement on the basis of a job analysis would provide all employers within this industry with a simple mechanism for excluding females. Fourth, based on the testimony of Dr. Shapiro and of Dr. Owens, the Court concludes that the Position Analysis Questionnaire (PAQ), which was used by defendant on its job analysis, is not an appropriate tool to use in

attempts at content validation. *Id.* at pp. 1566–67.

29. The findings of the Meredith report, which was introduced by defendant, weigh against the conclusion found in defendant's job analysis that there is a significant correlation between past experience and safety. The said report attempts to measure the characteristics of Bowman employees for purposes of relating them to their safety records. Defendant's Exhibit 13. Six of the seven factors enumerated by the said report as contributors to safety, as conceded by defendant's witness Miss Shaffer, do not relate to whether or not an individual has had past truck driving experience. Transcript at pp. 918–20.

30. The Court concludes that Defendant's Exhibit 516, a study of the relationship concerning fatigue, hours of service, and safety operations of truck and bus drivers, does not validate Bowman's experience requirement. The said study makes at most a negligible contribution to defendant's overall attempts at criterion validation.

31. Bowman's accident study does not validate its experience requirement for the following reasons. First, the study's methodology does not comply with either the American Psychological Association's (APA) or the *Uniform Guidelines'* standards. These standards require that criterion validation studies be based upon samples which reflect current hirees. *See,* Standards for Educational and Psychological Testing of APA, E61 and § 14(b)(4) of the Uniform Guidelines. Transcript at pp. 1511–13. In the study in question, all of the individuals in the sample were hired before 1975 by defendant and were still employed by Bowman at the time the study was made. Furthermore, Dr. Ledvinka acknowledged that he did not know whether the drivers in the accident study were representative of Bowman's present hirees. *Id.* at 812. Defendant's witness Dr. Owens testified that the accident study is not a concurrent validity study because it is not based on a sample of current hirees. *Id.* at p. 1286.

Second, the persuasiveness of defendant's accident study is further diminished by the fact that it does not attempt to control the effect that other variables, such as age, might have upon safety. Transcript at pp. 515–16, 520, 814–16. Third, the study's lack of a longitudinal base undercuts its evidentiary value. Dr. Shapiro indicated that a proper criterion validity study would have been longitudinal in nature and, therefore, would have shown in which year(s) the accident(s) for each driver occurred. Without such data, defendant's accident study at most demonstrates some general correlation between safety and past experience; it does not demonstrate a correlation between defendant's posted requirement and safe driving.

32. The Court finds defendant's utility or practical significance studies, Defendant's Exhibit 1176, fail to validate Bowman's experience requirement. These studies attempt to demonstrate that defendant's experience requirement has reduced its accident rate and consequently the number of injuries and fatalities caused by defendant's drivers. First, like defendant's attempt at content validity (job analysis), these studies were performed immediately prior to trial. Second, the studies are based upon the accident rate drawn from Defendant's Exhibits 6 and 18, and are, therefore, subject to the same previously discussed defects as the accident study itself. Third, plaintiffs demonstrated at trial to the Court's satisfaction that there are numerous assumptions incorporated into these studies which are either illogical or in conflict with the evidence. Specifically, defendant calculated a total cost of each additional accident by adding the cost of the accident and the cost of liability insurance to reach the figure of $1364 per accident. Transcript at pp. 832, 834. This addition is contrary to common sense; after all, defendant's insurance costs do not vary significantly give or take a few more accidents per year.

Furthermore, the said studies assume that if the experience requirement were not enforced, defendant's entire road driver work force, approximately 770–800 drivers,

would consist of inexperienced drivers. Transcript at p. 837. However, the evidence shows that the yearly turnover for defendant's road drivers is approximately 20%, and not 100%. *Id.* at pp. 1543, 1546; Defendant's Exhibit 12, p. 27. Also, the composition of defendant's work force prior to its imposition of the experience requirement, as shown in Defendant's Exhibit 6, demonstrates that the lack of an experience requirement does not result in the hiring of a totally inexperienced work force. The said exhibit shows that even without the experience requirement, only 29.2% or 42.4 hirees yearly would not satisfy the said experience requirement.

33. The testimony of Dr. Shapiro demonstrated, based on defendant's own data, that the practical significance of defendant's experience requirement is as follows. First, defendant's Accident Study, Defendant's Exhibits 6 and 18, indicate that a person in violation of the posted requirement could be expected to have one additional accident every ten years, or .1 additional accident per year, in comparison with those hired with at least one year prior experience (Transcript at p. 41). Second, the actual average cost of an accident by a Bowman driver, excluding the cost of insurance, is $416 (Defendant's Exhibit 13, p. 24). Thus, the average increased cost per new hiree who does not meet the experience requirement is $46.62 per year (Transcript at pp. 1541–43, 1545). Third, the annual number of new hirees that Bowman would be expected to hire is 145, this assumes a 20% turnover on a work force of approximately 770 road drivers. Fourth, defendant's Exhibit 6 shows that Bowman can expect that 26.7% or approximately 42.5 of its new hirees will not otherwise satisfy its experience requirement if it were not in force. Therefore, these 42.4 new hirees would be expected to result in an increased accident cost per year of $1755 (42.4 hirees times $41.62). The Court finds this amount de minimis for an enterprise of the size of Bowman.

## LESS DISCRIMINATORY ALTERNATIVES

34. The Court finds that plaintiffs have shown the existence of a less discriminatory alternative for the selection of road drivers. The alternative would be the use of a trainee program such as the one used by defendant until 1974. Transcript at pp. 1576–77. Defendant's witness Mr. Charles Rogers, an insurance specialist, and Defendant's Exhibit 12 (The Meredith Report), indicate that the period in which an inexperienced driver is most likely to be involved in a disproportionately high number of accidents is approximately the first 90 days of employment. Accordingly, a trainee program which would assign an experienced driver to co-drive with an inexperienced hiree for at least the first three months of employment would reduce the increased risk of accidents during this period. Transcript at pp. 1577–78.

35. Such a program would not constitute a prohibitive or significant cost to defendant, given that Bowman presently has a policy of assigning hirees to drive initially with experienced drivers for a period of two weeks to two months. *Id.* at pp. 1023, 1377. Moreover, defendant's employment application specifically states that driver-employees are subject to transfer to any one of defendant's terminals. Thus, if the assignment of experienced drivers to co-drive with trainees for a period of time require temporary transfer of experienced drivers or hirees to other terminals, such action would not entail a change of Bowman's present employment guidelines. Furthermore, the trainee program could also involve the requirement that new hirees without one year prior experience be graduates of reputable driver-trainee schools approved by defendant. *Id.* at pp. 1578–79.

36. Driver trainee programs are used at other trucking companies. Transcript at pp. 366, 368. Mr. Rogers testified that some of the trucking companies that employ driver-trainee programs are offered insurance rates lower than Rogers' company recently offered Bowman Transportation. *Id.* at pp. 369–70. Rogers also testified that there are trucking driving schools available which offer students adequate training. *Id.* at p. 378.

## DISPARATE TREATMENT CLAIM

37. Plaintiffs demonstrated at trial that some 60 males were hired by defendant for over-the-road driver positions between January 1, 1975 and December 31, 1980 without meeting one or more of the elements of defendant's posted prior experience requirement. *See,* Plaintiffs' Exhibit 229 (summary of males hired in violation of the experience requirement with appropriate exhibit citations and descriptions).

38. Since defendant has been unable to specify when in 1974 it imposed its prior experience requirement, the Court concludes that at least some of the additional twelve males hired in 1974, without one year of prior experience, were employed in violation of Bowman's prior experience requirement. *See* Plaintiffs' Exhibit 229.

39. The record also shows that a number of male applicants for over-the-road driver positions had their applications processed by defendant despite the fact that their applications showed on their face that these applicants did not satisfy the prior experience requirement. *See,* Plaintiffs' Exhibits 80, 111, 112, 114, 115, 116, 125, and 129. With respect to the application of Glenn Hull, Plaintiffs' Exhibit 80, the Court gives greater credence to the information in Mr. Hull's application, which fails to indicate sufficient prior experience as an over-the-road tractor trailer driver, than to the testimony of Mr. Dellinger, who testified that Mr. Hull possessed three years OTR experience when he was hired by Bowman. Transcript at p. 1140.

40. The Court finds defendant's attempts to rebut plaintiffs' showing that numerous male applicants were hired in violation of the prior experience requirement unpersuasive. *See,* Defendant's Exhibit 1213. First, defendant indicates that a number of the 72 individuals listed in Plaintiffs' Exhibit 229 were initially hired at terminals other than Atlanta. *See* ¶¶ 37–38, *supra.* Even if that were the case, the evidence shows that Bowman's system-wide director of safety and personnel, Mr. Wood, has the ultimate hiring authority for all road drivers company-wide. Second, under defendant's normal operating procedures, the Atlanta office has the authority to review the applications of new hirees for over-the-road driver positions, regardless of where the driver in question was hired, and in many cases does so during a hiree's 45-day probationary period. Transcript at p. 210. *Id.* at 210–11. Thus, in light of the centralized hiring procedure of defendant, the fact that some of the hirees listed in Plaintiffs' Exhibit 229 were initially hired at other terminals is irrelevant.

Third, defendant indicates that many of the male applicants allegedly hired in violation of its experience requirement had some form of past driving experience, including city tractor trailer experience, non-tractor trailer driving experience, or OTR experience amounting to less than one year. Although such evidence is relevant for this Court's ultimate determination of whether plaintiffs or the class members are entitled to back pay, such evidence does not rebut plaintiffs' showing that these males were hired by defendant in violation of its posted prior experience requirement.

41. With respect to any individuals listed in Plaintiffs' Exhibit 229 who were hired in the Birmingham region, the Court has already concluded that the one-year prior experience requirement had been in effect in the Birmingham region since 1976. Therefore, any applicant hired in the said region since 1976, without one year prior experience, was hired in violation of defendant's prior experience requirement. *See* ¶ 2, *supra.*

42. As shown below, defendant's use of the prior experience requirement as a tool to deny employment to female applicants supports plaintiff's disparate treatment claims. For example, the application of class member Carolyn Hewitt indicates that she had nine months OTR experience and had graduated from a truck driving school. Transcript at p. 1035 and Plaintiffs' Exhibit 147. Mr. Wood testified that Miss Hewitt was rejected because her past employer reference checks indicated that she could not unload a truck. Transcript at p. 1036. To the contrary, in his January 31, 1980 affida-

vit, Mr. Wood stated that Miss Hewitt was not hired because she did not satisfy the one year prior experience requirement and said nothing about Miss Hewitt's alleged inability to unload a truck. Furthermore, Mr. Wood admitted at the trial that he had approved the hiring of other applicants less qualified than Miss Hewitt. *Id.* at p. 1037. The Court finds Bowman's rejection of Miss Hewitt on the alleged ground of her lack of strength to be pretextual.

43. The issue of whether plaintiffs, as a class or as individuals, were rejected because they are physically incapable of performing the duties of a road driver was not raised in this litigation. With the exception of Miss Hewitt's application, defendant made no claim that plaintiffs or class members were rejected because of the lack of strength. The evidence shows that defendant does not administer any strength tests to applicants for over-the-road driver positions. Transcript at p. 1444. Moreover, the record shows that a significant proportion of Bowman's small number of women road drivers are small in stature. *See,* Plaintiffs' Exhibits 167, 169, 170, 173, 176, and 182. Additionally, Bowman drivers are normally able to obtain assistance to unload their trucks. Former Bowman road driver Daisy Nile testified that she never experienced a situation where she was unable to find someone to unload her truck. Transcript at pp. 127–28. Indeed, the existing collective bargaining agreement between Bowman and the United Steelworkers provides that a driver is given $38 to pay for the unloading of each truck load. *Id.* at p. 424.

44. The application of class member Veronica Carpenter shows two years of experience as a city, tractor, tanker-trailer driver. Plaintiffs' Exhibit 149. Her application was rejected by defendant because she lacked over-the-road experience. Defendant's Exhibit 1211, p. 5 (Wood's affidavit). Moreover, the notation on Miss Carpenter's application indicates that she was rejected because she had "no OTR experience", and neither the notation nor any other document in her application indicates that she was rejected because her prior experience involved tanker, as opposed to van driving.

45. The application of class member Peggy Jeffress was rejected by defendant because of her lack of prior experience. Transcript at pp. 1077–78.

46. When class member Jon M. Martin applied at Bowman's Atlanta terminal in 1976, she was told that defendant was not willing to assign her as a co-driver with any of the male drivers because this would cause problems and there were no female drivers available with whom Martin could co-drive. Transcript at pp. 29–33.

47. When class member Wanda Tarvin sought employment with defendant, Mr. Tarvin, a driver for Bowman, approached Mr. Wood regarding the possibility of Bowman's hiring of his wife. Transcript at p. 62. During their conversation, Mr. Wood suggested, although he was aware that Ms. Tarvin did not meet Bowman's prior experience requirement, that if the Tarvins obtained a letter from someone indicating that Ms. Tarvin had at least one year OTR experience Bowman would employ her. *Id.* at p. 63.

48. When former plaintiff Edna Kilgo went to defendant's Atlanta terminal to apply for an over-the-road position, she was informed that Bowman was not willing to assign her to a truck with a male co-driver. Transcript at pp. 153–55.

49. The application of class member Linda Raines indicates that she applied in 1976 and that she satisfied defendant's posted prior experience requirement. Plaintiffs' Exhibit 140. At trial, Mr. Wood testified that he was unable to verify Ms. Raines' past employment and that he had tried unsuccessfully to contact her through her past employer. Transcript at pp. 1402–03. Mr. Wood acknowledged that it was "possible" that he had hired people without verification of past driving experience. *Id.* at 1041. *See also,* Plaintiffs' Exhibits 11, 17, 63, 64 for males hired without verification of past experience. The application of Ms. Raines contains no notation to the effect that she was rejected because of lack of verification of prior employment. Plain-

tiffs' Exhibit 140. Additionally, Mr. Wood's affidavit of January 31, 1980 does not state that he had tried to contact Ms. Raines through her previous employer; nothing in Ms. Raines's application indicates that she was offered employment by defendant.

50. Class member Georgia L. McIntyre applied to Bowman in November of 1980 and satisfied the prior experience requirement. Plaintiffs' Exhibit 136. In his deposition of April 9, 1981, Mr. Wood stated that he knew of no reason why Ms. McIntyre was not offered employment. Transcript at p. 1074. However, at trial Mr. Wood stated that Ms. McIntyre was not offered a position because reference checks indicated that she had held 12 jobs in 12 years and that she had suffered a back injury during a prior accident. *Id.* at p. 1065. Nevertheless, nothing in Ms. McIntyre's application indicates that she was disqualified because of a past injury or frequent changes in past employment. *Id.* at p. 1075; Plaintiffs' Exhibit 136. The Court concludes that defendant has offered no credible evidence to explain why it refused to hire Ms. McIntyre.

51. Class member Willa J. Foster applied in 1981 to Bowman and at that time Ms. Foster, a resident of Louisville, Kentucky, with a family, had three years OTR experience. Transcript at pp. 173, 175. During a telephone conversation with Mr. Wood, which Ms. Foster initiated to obtain information regarding her application, Mr. Wood told her that Bowman would hire her as a road driver on the condition that she be available for work *the next day* at defendant's Birmingham terminal. *Id.* at p. 176. This unreasonable request by defendant is tantamount to a refusal to hire Ms. Foster. No further offer of employment was made to Ms. Foster.

52. The application of class member Rita Hart was rejected by defendant in 1977 because of its anti-nepotism rule. Transcript at pp. 318–20. This asserted ground for rejection of Ms. Hart's application appears to be pretextual in light of Mr. Wood's testimony that defendant's anti-nepotism rule only began to be enforced when a memorandum to that effect was issued in 1978. *Id.* at p. 317.

53. There is no designated place on Bowman's application for employment or any other document of defendant for the notation of reasons for the rejection of an applicant. Transcript at p. 1080. This practice lends itself to an ipso facto claim by defendant of the purported reasons for the rejection of a particular candidate, whereas those reasons might have little or nothing to do with the real motives of defendant for rejecting a particular applicant.

54. Daisy Lile, who was employed as an OTR driver by Bowman from May 1977 until December 1978, testified that during her period of employment she was required to use the same bathroom, shower, and bunk facilities that were used by the male drivers, and this policy did not change during her period of employment with Bowman. Transcript at pp. 123, 125. As late as April 9, 1981, Bowman was not providing separate shower and bathroom facilities for its women drivers. *Id.* at p. 1014. At trial defendant introduced no evidence to show that separate facilities were being provided for women drivers. Indeed, at a meeting between Bowman president, Garfield Salyer, and union representatives the subject of lack of separate sleeping, bathroom and shower facilities for women drivers was raised by the union representatives. *Id.* at pp. 441–42. At that time, Bowman's president stated that "under no circumstances" was Bowman going to provide separate facilities for women drivers. *Id.* at 442.

55. The evidence shows that defendant's representatives often told female applicants for over-the-road driving positions that they would be assigned to co-drive with a male driver of a different race. Transcript at pp. 131, 308, 444–45, 126. The uncontroverted evidence, however, indicates that a racially integrated driving team within Bowman's system is a very rare phenomenon. Mr. Luther Tarvin testified that during his 13 years with Bowman he had known of only two racially integrated teams. *Id.* at 66. *See also Id.* at pp. 310–11, 427, 437, and 442. This appears to be another ploy used by

defendant to discourage female applicants for over-the-road driver positions.

56. Defendant attempted to justify either the non-enforcement of its experience requirement or the non-enforcement of the OTR element thereof by reference to a preference for drivers who have driven in all four seasons and who have driven in different terrains. The Court finds this attempt unpersuasive. First, Mr. Wood testified that he had issued no written guidelines concerning this unstated preference for types of past driving experience. Transcript at pp. 240–41. Second, Mr. Wood indicated that no applicant to his knowledge had ever been rejected because he or she had not driven in different types of terrain or had not driven in bad weather conditions. *Id.* at pp. 251–53. Mr. Wood also testified that it was "possible" that persons had been hired who had not driven in different terrains. *Id.* at 252, 255. Additionally, neither the posted experience requirement nor the one defendant claims is in effect mentions anything concerning a four seasons or different terrains requirement or preference. Accordingly, the Court concludes that defendant does not have a four seasons or a different terrains requirement.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over the instant action pursuant to 28 U.S.C. § 1343(3) and 42 U.S.C. § 2000e–5(f). This Court's declaratory judgment is authorized by 28 U.S.C. §§ 2201 and 2202 and by Rule 57, F.R.Civ.P. Venue is proper in this district.

2. In order to succeed on their adverse impact claim, plaintiffs must show by a preponderance of the evidence that a facially neutral employment standard, such as defendant's prior experience requirement, has a discriminatory impact on women as a class. *Griggs v. Duke Power Co.,* 401 U.S. 424, 432, 91 S.Ct. 849, 854, 28 L.Ed.2d 158 (1971); *Dothard v. Rawlinson,* 433 U.S. 321, 329, 97 S.Ct. 2720, 2726, 53 L.Ed.2d 786 (1977). Plaintiffs need not prove a discriminatory motive on the part of defendant to succeed on their adverse impact claim. *Griggs, supra,* 401 U.S. at 430–32, 91 S.Ct. at 853–54.

3. Where gross statistical disparities can be shown, plaintiffs may rely on this statistical proof by itself to establish their prima facie case of adverse impact. *Hazelwood School District v. United States,* 433 U.S. 299, 307–08, 97 S.Ct. 2736, 2741, 53 L.Ed.2d 768 (1977).

> Statistics showing . . . [sexual] . . . imbalance are probative in a case such as this one only because such imbalance is often a telltale sign of purposeful discrimination; absent explanation, it is ordinarily to be expected that non-discriminatory hiring practices will in time result in a work force more or less representative of the . . . [sexual] . . . composition of the population in the community from which employees are hired. Evidence of long lasting and gross disparity between the composition of a work force and that of the general population thus may be significant even though § 703(j) makes clear that Title VII imposes no requirement that a work force mirror the general population.

*International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 340 n. 20, 97 S.Ct. 1843, 1856 n. 20, 52 L.Ed.2d 396 (1977).

4. When special skills or training are required to qualify for particular jobs, comparison of defendant's employment record to the general population, as opposed to the smaller group of individuals who have the necessary skills or training, may have little probative value. *Hazelwood, supra,* 433 U.S. at 308 n. 13, 97 S.Ct. at 2742 n. 13. On the other hand, where the job skills in question are the kind that "many persons possess or can fairly readily acquire," general population data has proved acceptable. *Id.* Indeed, in *Hazelwood* the Supreme Court noted that truck driving, the skill in question in *Teamsters,* and also in this action, "is one that many persons possess or can fairly readily acquire." *Id.* Therefore, the use of general population data is acceptable in this action.

5. Furthermore, it is not necessary that a statistical showing of disproportionate impact be based on analysis of the characteristics of actual applicants. *Dothard, supra,* 433 U.S. at 330, 97 S.Ct. at 2727. As noted by the Supreme Court in *Dothard,* "[t]he application process might itself not adequately reflect the actual potential applicant pool, since otherwise qualified people might be discouraged from applying because of a self-recognized inability to meet the very standard challenged as being discriminatory." *Id.* In this case, the Court has specifically found, at paragraph 17, *supra,* that defendant's applicant flow for over-the-road drivers is not an appropriate labor pool for various reasons noted therein.

6. Here, the Court has concluded that plaintiffs have made out their prima facie case in support of their adverse impact claim. *See* ¶ 18, *supra.* A comparison of the defendant's female hirees for over-the-road truck driver positions with the relevant labor pools discussed herein more than amply support an inference that a substantially greater percentage of females have been denied employment with defendant because of the said experience requirement. *See* ¶¶ 7–13, *supra.*

7. Once plaintiffs have made their prima facie case of adverse impact, as plaintiffs have done in this case, defendant must prove by a preponderance of the evidence that the requirement in question is job related and is required by business necessity. *Johnson v. Uncle Ben's Inc.,* 657 F.2d 750, 753 (5th Cir.1981), *cert. denied,* —— U.S. ——, 103 S.Ct. 293, 74 L.Ed.2d 277 (1982). The business necessity test essentially involves balancing the need for the challenged practice or policy against its discriminatory impact. The business purpose must be "sufficiently compelling to override any [impermissible] impact"; it must "effectively and efficiently" carry out its business purpose; and there must be no acceptable alternative practice. *Rodriguez v. East Texas Motor Freight,* 505 F.2d 40, 56–57 (5th Cir.1974), *rev'd. on other*

grounds, 431 U.S. 395, 97 S.Ct. 1891, 52 L.Ed.2d 453 (1977).

8. The studies introduced by defendant in its efforts to demonstrate a correlation between prior experience and fewer accidents fail to show a statistically significant correlation between the said factors and are poorly and improperly constructed, as noted herein. *See* ¶ 26, *supra.* Furthermore, defendant's eleventh hour attempt to validate the said requirement by the purported content validity study does not meet the requirements of Title VII. The record shows that no validation study was done, attempted or even contemplated, prior to the imposition of the requirement in 1974. Moreover, the Meredith study was not done until after the filing of this litigation, and defendant's job analysis and content validity study were not even commenced until the month before the trial of this action. Accordingly, the Court concludes that defendant has failed to show that the prior experience requirement is job-related.

9. Nevertheless, assuming that defendant has tendered sufficient evidence to show the business necessity of the challenged requirement, plaintiffs have the opportunity to show that "other tests or selection devices, without similarly undesirable ... effect would also serve [Bowman's] legitimate interest in 'efficient and trustworthy workmanship.'" *Albemarle Paper Company v. Moody,* 422 U.S. 405, 425, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280 (1975). Such a showing would be evidence that the requirement in question, although job-related, was used merely as a "pretext" to discriminate against women. *Id.*

10. After a close review of the evidence, the Court concludes, assuming that the prior experience requirement is job-related, that defendant has used the said requirement as a pretext to discriminate against women as a class. As noted earlier, at the outset defendant contended that the requirement was imposed because of the availability of laid-off experienced drivers. *See* ¶ 22, *infra.* Later, after two years of this litigation, defendant asserted that it

was imposed to obtain lower insurance rates. At the trial defendant also attempted to validate the requirement as a safety measure. The Court finds it highly suspect that defendant needed two years of litigation to discover the true reasons for the imposition of the prior experience requirement. Furthermore, the extensive showing that the requirement was not enforced with respect to many male applicants and strictly enforced against female applicants dispels any doubt in the Court's mind that the requirement was systematically used to deter female applicants from obtaining employment with defendant. The showing by plaintiffs that there are less discriminatory alternatives for the selection of road drivers provides additional support for this Court's conclusion that Bowman has used the prior experience requirement merely as a pretext for discrimination. *See ¶¶ 34–36, supra.*

11. In order for plaintiffs to succeed on their claim that defendant regularly and purposefully engaged in a pattern and practice of disparate treatment of women applicants for road driver positions, they must prove by a preponderance of the evidence that defendant has engaged in a system-wide pattern or practice of discrimination against women applicants. *Teamsters, supra,* 431 U.S. at 335–36, 97 S.Ct. at 1854. To establish their prima facie case of disparate treatment, plaintiffs must prove by a preponderance of the evidence that they and the class members applied for available positions as over-the-road drivers with defendant, for which they were qualified except for the requirement in question, but were rejected under circumstances which give rise to an inference of unlawful discrimination. *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981).

12. The Court concludes that plaintiffs have established a prima facie case of a pattern and practice of disparate treatment of women applicants for over-the-road positions by defendant. The evidence of defendant's treatment of plaintiffs and the class members bolsters their statistical proof. For instance, defendant discouraged class members from obtaining employment as an over-the-road driver on the ground that it was not willing to assign them as a co-driver with any of the male drivers because it would cause problems and there were no female drivers available with whom they could co-drive. *See ¶¶ 46, 48, supra.* Second, the record shows that Bowman has refused to provide separate bathroom and sleeping facilities for women over-the-road drivers. *See ¶ 54, supra.* Third, the evidence shows that defendant's representatives often discouraged prospective female applicants for over-the-road driver positions from applying by telling them that they would have to co-drive with a male driver of a different race, whereas that was a highly unlikely possibility. *See ¶ 55, supra.* Fourth, the evidence further shows that plaintiffs and class members were in some instances refused applications for over-the-road positions, were given false or misleading information regarding requirements for the said positions, or that they were otherwise dissuaded or discouraged from applying to defendant. Fifth, defendant hired many male applicants who had bad driving records, or who did not meet the prior experience requirement.

13. In order to carry their prima facie burden at the initial liability stage, plaintiffs are not required to offer evidence that each person for whom they will ultimately seek relief was the victim of defendant's pattern of discrimination. The focus at this stage is not on the individual hiring decisions, but on defendant's pattern of discriminatory decision making. *Teamsters,* 431 U.S. at 360, n. 46, 97 S.Ct. at 1867, n. 46; *Payne v. Travenol Laboratories, Inc.,* 673 F.2d 798, 818 (5th Cir.1982). Of course, at the damage phase of this litigation, defendant may establish that any or all plaintiffs and class members are not entitled to back pay because they would not have been hired, without regard to the experience requirement, because of a bona fide employment criterion.

14. Once plaintiffs have shown a prima facie case that defendant has pursued a policy of discriminatory hiring against fe-

male applicants for over-the-road applicants, as plaintiffs have accomplished in this case, Bowman may rebut this showing by (1) proof that plaintiffs' statistics are inaccurate or insignificant and/or (2) it may provide a non-discriminatory explanation for the apparently discriminatory result. *Teamsters, supra,* 431 U.S. at 360 n. 46, 97 S.Ct. at 1867, n. 46. "General assertions of good faith or of hiring only the best applicants, however, are insufficient to meet this burden." *Payne, supra,* at 817.

15. Bowman has failed to establish that the gross disparities between the female portions of its own work force and the female proportions of the various truck drivers work forces or even of the general civilian work force is due to deficiencies in plaintiffs' statistics or entirely or even to a large extent, to any alleged lack of female interest in the job of over-the-road truck driver. The Court finds defendant's attempt to rebut plaintiffs' case by attempting to articulate legitimate non-discriminatory reasons for its denial of employment to plaintiffs and class members unconvincing. The record is replete with instances where defendant's representatives testified at trial that a particular class member was denied employment because of a legitimate reason which contradicted the reasons stated originally for such denial.

16. Assuming, arguendo, that defendant has produced evidence that plaintiffs were rejected for legitimate, non-discriminatory reasons, this Court concludes that defendant's denial of employment to plaintiffs and the various class members because of the experience requirement is pretextual. There are just too many contradictions in Bowman's explanations for its denial of employment to female applicants and too many instances of employment of male applicants who lacked the prior experience for this Court to give any credence to Bowman's explanation for rejecting female applicants.

## CONCLUSION

17. Plaintiffs' motion for redefinition of the class, as it relates to the disparate impact claim, is GRANTED.

18. Plaintiffs' motion to consolidate this action with *Tarvin v. Bowman Transportation,* Civil Action No. C82–2679A, is DENIED.

19. The Court concludes that Bowman's enforcement of its prior experience requirement for over-the-road tractor trailer drivers has an adverse impact upon women applicants. The Court further finds that Bowman has used the said requirement since it was imposed in 1974 to discriminate against women. The Court further finds that defendant has failed to show through its various studies or any other evidence that the said requirement is job-related, or otherwise a business necessity. Furthermore, even if such a business necessity had been shown, plaintiffs have shown by a preponderance of the evidence that there are less discriminatory alternatives which would satisfy defendant's legitimate business needs.

20. The Court finds that plaintiffs have shown by a preponderance of the evidence that defendant has engaged in a pattern or practice of disparate treatment against female applicants for over-the-road tractor trailer driver positions in violation of Title VII.

21. In light of this Court's findings of fact and conclusions of law, the parties are hereby ORDERED to file with the Court, within thirty days from this date, proposals concerning the appropriate injunctive and declaratory relief sought by plaintiffs and proposals concerning disposition of plaintiffs' and class members' back pay claims.

IT IS SO ORDERED, this 20th day of May, 1983.